1   BRIAN J. STRETCH (CABN 163973)
    United States Attorney
2
    BARBARA J. VALLIERE (DCBN 439353)
3   Chief, Criminal Division

4   JOHN H. HEMANN (CABN 165823)
    JOSEPH E. SPRINGSTEEN (DC 474317)
5   LAURA VARTAIN HORN (CABN 258485)
    Assistant United States Attorneys
6
        450 Golden Gate Avenue, Box 36055
7       San Francisco, California 94102-3495
        Telephone: (415) 436-6831
8       Laura.Vartain@usdoj.gov

9   Attorneys for United States of America

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14   UNITED STATES OF AMERICA,          )   CASE NO. CR 16-0172 JD
                                        )
15          Plaintiff,                  )   UNITED STATES' TRIAL BRIEF AND PRETRIAL
                                        )   CONFERENCE STATEMENT
16      v.                              )
                                        )   Trial Date: July 6, 2017
17   JING ZENG,                         )   Court: The Hon. James Donato
                                        )
18          Defendant.                  )
     _____)

19

20

21

22

23

24

25

26

27

28

UNITED STATES' TRIAL BRIEF
CR 16-172 JD

# TABLE OF CONTENTS

I.     STATEMENT OF THE CASE...................................................................................1

       A.     Overview............................................................................................................1

       B.     Background Regarding the Evidence...............................................................3

              1.     The Elements........................................................................................3

              2.     Background About MZ........................................................................3

              3.     Defendant's Employment at MZ .........................................................4

       C.     Additional Evidence of Zeng's Intent.............................................................8

       D.     Zeng's Recorded Interview with CEO Leydon ...............................................9

       E.     Expert Testimony...........................................................................................10

II.    THE EVIDENCE PROVES EACH ELEMENT BEYOND A REASONABLE
       DOUBT............................................................................................................................11

       A.     The Evidence Establishes that Zeng Knowingly Transmitted a Code or
              Command.........................................................................................................11

       B.     The Evidence Establishes that Zeng Intentionally Caused Damage Without
              Authorization. ................................................................................................14

              1.     Zeng Damaged the Machine Zone Laptop........................................14

              2.     Zeng Intended to Cause Damage. .....................................................16

              3.     Zeng Was Not Authorized to Damage the MZ Computer.................18

       C.     The Evidence Establishes Loss Sufficient to Trigger a Felony. ....................19

III.   DISPUTED EVIDENTIARY ISSUES ............................................................................20

       A.     Evidence Regarding Zeng's Efforts to Start a Gaming Company in China,
              Before and After July 15 2015, are Relevant to Intent. ................................20

              1.     WeChats Before July 15, 2015 .........................................................21

              2.     WeChats After July 15, 2015, and the Dracaena Powerpoint...........21

       B.     Defendant Cannot Call an Expert Given His Failure to Comply with Rule 16.................22

IV.    PRETRIAL CONFERENCE STATEMENT ...................................................................23

       A.     Disclosures (Crim. L.R. 17.1-1(1)-(3)) .........................................................23

       B.     Stipulations (Crim L.R. 17.1-1(b)(4)) ...........................................................23

C.      Need for Interpreters (Crim. L. R. 17.1-1(b)(5)) .................................................24

D.      Dismissal of Counts/Elimination of Issues (Crim L.R. 17.1-1(b)(6)) .............................24

E.      Joinder/Severence (Crim. L.R. 17.1-1(b)(7)).................................................24

F.      Informants, Identification Issues, Prior Convictions (Crim. L.R. 17.1(b)(8)) ..................24

G.      Pretrial Exchange of Witnesses and Documents (Crim. L.R. 17.1(b)(9-10))..................24

H.      Objections to Exhibits Or Testimony (Crim. L.R. 17.1(b)(11)) .........................................24

I.      Legal Issues Likely to Arise at Trial (Crim L.R. 17.1(b)(12)) .......................................24

J.      Scheduling (Crim. L.R. 17.1-1(b)(13))........................................................24

K.      Jury Voir Dire and Jury Instructions (Crim. L.R. 17.1-1(b)(14)).......................................25

# TABLE OF AUTHORITIES

## Cases

*Brady v. Maryland*,

373 U.S. 83 (1963)..................................................................................................... 23

*Custom Packaging Supply, Inc., v. Phillips*,

2016 WL 153220 (E.D. Cal., April 15, 2016) ........................................................... 16

*Giglio v. United States*,

405 U.S. 150 (1972)................................................................................................... 23

*Global Policy Ptnrs, LLC v. Yessin*,

686 F. Supp. 642 (E.D. Va 2010) ........................................................................ 19, 20

*International Airport Centers, LLC v. Citrin*,

440 F. 3d  (7th Cir. 2006) ............................................................................ 11, 12, 13

*KLA-Tencor Corp. v. Murphy*,

717 F. Supp.2d 895 (N.D.Cal. 2010) .............................................................. 13, 15, 19

*Law, Inc. v. Capital Legal Solutions, LLC*,

786 F. Supp. 2d 1114 (E.D. Va. 2011) ...................................................................... 19

*Lockheed Martin Corporation v. Speed*,

2006 WL 2683058 (M.D. Fla. August 1, 2006)............................................... 16, 17, 18

*Melgar v. Zicam LLC*,

No. 2:14-CV-0160 MCE AC, 2015 WL 5255391 (E.D. Cal. Sept. 9, 2015) ...................... 22

*United States v. Aceves-Rosales*,

832 F.2d 1155 (9th Cir. 1987) ................................................................................... 24

*United States v. Henthorn,*

   931 F.2d 29 (9th Cir. 1991) ............................................................... 23

*United States v. Middleton,*

   231 F.3d 1207 (9th Cir. 2000) ............................................................ 19

*United States v. Nash,*

   115 F.3d 1431 (9th Cir. 1997) ............................................................ 24

*United States v. Sablan,*

   92 F.3d 865 (9th Cir.1996) ................................................................. 19

*United States v. Scholl,*

   166 F.3d 964 (9th Cir. 1999) .............................................................. 24

*United States v. Soliman,*

   813 F.2d 277 (9th Cir. 1987) .............................................................. 21

*United States v. Verduzco,*

   373 F.3d 1022 (9th Cir. 2004) ............................................................ 22

**Statutes**

18 U.S.C. § 1030(a)(5) .......................................................................... 11

18 U.S.C. § 1030(a)(5)(A) .............................................................. 1, 3, 11, 19

18 U.S.C. § 1030(e)(11) ........................................................................ 19

18 U.S.C. § 1030(e)(8) ..................................................................... 14, 16

18 U.S.C. § 3500 .................................................................................. 23

I.      **STATEMENT OF THE CASE**

A.      **Overview**

Defendant Jing Zeng is charged with violating 18 U.S.C. § 1030(a)(5)(A) – Intentionally Causing Damage to a Protected Computer.  The charge arises from defendant Zeng's intentional wiping and reformatting of a laptop loaned to him by his employer, Machine Zone, Inc. ("MZ").[1]  Zeng's wiping and reformatting the computer ("the MZ laptop") caused damage by deleting systems, data and company files, in an apparent attempt to conceal Zeng's efforts to access, review, and utilize sensitive and proprietary company data prior to his separation from the company.

In 2015, MZ was well-known in Silicon Valley for its popular web-based strategy game Game of War: Fire Age.  What those playing the games perhaps did not recognize, but competitors and the industry knew, was that the games' massive financial success was driven, in part, by MZ's unique digital platform, performance marketing, and unparalleled data capabilities.  Although these areas were not part of Zeng's job duties, shortly prior to his separation from the company, Zeng began accumulating information regarding MZ's marketing and business operations and digital platform.

At the beginning of his employment with MZ, Zeng received a company-owned laptop and signed an agreement not to alter or damage it.  Immediately upon his separation from MZ, Zeng took steps to wipe, reformat, and thus damage the intended function of the laptop and the data on it.  In the days leading up to this act, and contemporaneous with the unraveling of his employment with the company, Zeng had utilized the company laptop to access large volumes of sensitive and highly confidential company data from MZ's internal business intelligence database, "Tableau."  The electronic files Zeng accessed contained sensitive company information regarding revenue analytics, player habits and expenses that shed substantial light on MZ's financial success.  Though his access to the data files had not been restricted, Zeng had no legitimate business purpose to open, view, print, and/or copy these sensitive files, particularly when and in the volume he did.  During the same time, Zeng accessed and possessed other sensitive company data that was in no way related to his job function at MZ.

Shortly thereafter, with his separation from MZ in progress and his access to company offices

---

[1] Since the conduct charged in this case, Machine Zone, Inc. has changed its name to MZ.

1  and systems terminated, Zeng wiped the MZ laptop, thus destroying log files and removing the digital

2  evidence of the sensitive data he had accessed.  Once the MZ laptop had been wiped, Zeng installed a

3  publicly-available Apple operating system (as opposed to MZ's version of the operating system layered

4  with MZ's customized software, which was not available to him).  Zeng then copied 175 files back on to

5  the computer.  Zeng's actions prevented MZ from accessing the MZ laptop with standard processes and

6  credentials; resulted in the loss of key MZ programs on the MZ laptop including one used to track the

7  security of the data on the computer; and permanently lost data stored only on that computer.

8        Zeng's conduct establishes that he specifically intended to wipe and damage the MZ laptop at the

9  time he learned he would not be able to stay with the company and would be required to return the

10 device.  During the hours and days prior to his separation, Zeng accessed sensitive company data while

11 also concurrently providing his MZ login access credentials to unknown individuals in China for the

12 purpose of allowing them to remotely access a beta version of MZ's forthcoming game, Mobile Strike.

13 A digital review of Zeng's personal cellphone by a FBI investigator revealed Zeng sent and received

14 numerous electronic communications with individuals in China to facilitate their access to MZ's

15 forthcoming game.  During these same late night and early morning hours, Zeng logged in to MZ's

16 systems and rapidly downloaded a substantial amount of sensitive company data using the MZ laptop.

17       Zeng was arrested by the FBI at San Francisco International Airport on August 20, 2015, while

18 attempting to board a flight to the People's Republic of China.  A search of the laptop computer that

19 Zeng was carrying contained documents indicating Zeng had initiated efforts to start a gaming project in

20 China.  Documents show that Zeng's proposed gaming company was modeled in part on data analytics

21 and other marketing and revenue generating techniques utilized by MZ and revealed in the sensitive

22 Tableau documents that he had accessed.  The search of his personal phone led to recovery of additional

23 WeChat communications regarding Zeng's efforts to start that gaming project in China, with direct

24 references to MZ's data capabilities.

25       This and other evidence establishes Zeng's motive to access sensitive MZ data and to hide

26 evidence of his access, and it establishes Zeng's intentional conduct regarding the damage he caused.

27 //

28

UNITED STATES' TRIAL BRIEF
CR 16-172 JD                                    2

### B.      Background Regarding the Evidence

#### 1.      The Elements

The evidence will prove beyond a reasonable doubt the elements of a violation of 18 U.S.C. § 1030(a)(5)(A):  (1) defendant knowingly caused the transmission of a code or command to a protected computer; (2) defendant thereby intentionally caused damage to a protected computer without authorization; and (3) as a result of such conduct, defendant caused loss to MZ during any one-year period of an aggregate value of $5,000 or more.

The government will call current and former MZ employees,[2] an expert witness from Stroz Friedberg who will testify about a forensic review and conclusions reached based on that review of the MZ laptop, and Special Agent Cecily Rometo from the Federal Bureau of Investigation.  The government has prepared photographs of each witness to assist the Court and will deliver those to chambers, together with the exhibits.

#### 2.      Background About MZ

MZ is a privately held high-technology company based in Palo Alto, California.  Founded in 2008, MZ has approximately 1,200 employees and millions of users located across the globe.  Although best known publicly for creating a series of popular strategy games for mobile devices, including Game of War:  Fire Age (released July 2013) and Mobile Strike (released later in 2015), MZ designed and currently operates a unique, complex digital platform engine that allows for billions of simultaneous digital connections in real time.  MZ's platform has the ability to transmit, translate, and receive over 500,000 messages per second.  For example, a group of 30 users in 30 different countries speaking 30 different languages can conduct a near real-time, active conversation in which all users are transmitting messages in their own native language; these messages are then near-instantaneously translated and transmitted to the other 29 users in each of their own 29 different languages.  This complex digital platform engine, combined with MZ's unique data analytics, proprietary marketing techniques, and

---

[2] The MZ witnesses (former and current employees) Kristen Dumont, JC Chau, Chris Snell, Thai Pham, Anthony Krainer and Melissa Lightbody.  Should the parties not reach stipulations on certain evidence, the government will call an additional few witnesses.

nimble programming has led to the company's success with two of the highest grossing mobile games of all time.

### 3.   Defendant's Employment at MZ

In November 2014, MZ hired defendant as Director of Global Infrastructure.  (Joint Stipulations, "Stipulated.")[3]  On November 26, 2014, Zeng executed an agreement with MZ concerning an Apple MacBook Pro laptop, Serial Number C02MN9YAFD57 ("the MZ laptop").  (Stipulated.)  Zeng agreed:

- "The employee shall not alter the equipment or change the use for which it was intended."  (Exhibit 1.)

- "Software shall not be altered, copied, added or transferred at anytime [sic], unless authorized by a manager or the IT Department."  *Id.*

- "In the event of damage, the employee shall not undertake or arrange for the repair of equipment.  It is the responsibility of the MZ IT Department to process such issues."  *Id.*

- "In the event of theft or damage, the employee must contact the IT department to notify them…within 2-3 days.  If the incident takes place after working hours, notice must occur straight away the next morning either by email, phone, and/or in person."  *Id.*

For a period of time between March 2015 and April 2015, Zeng served in the role of interim vice president of operations.  (Stipulated.)  In April 2015, MZ hired JC Chau to fill the role permanently.

In May 2015, Zeng told Chau that he wanted to leave his position in the "Operations" group to move to another group within MZ.  Zeng indicated that he was going to take a position with the "Platform" group.  (Chau Testimony.)  Chau asked Zeng to help with hiring his replacement, to which Zeng agreed.  Shortly thereafter, Chau announced Zeng's departure from the Operations group during a team meeting and later hosted a happy hour reception to recognize Zeng's time in the group, which Zeng attended.  Between June and early July 2015, Zeng assisted Chau in identifying and interviewing candidates for Zeng's position.  On July 8, 2015, MZ hired a candidate identified and vetted by Chau

---

[3] The parties are working towards a set of Joint Stipulations to expedite the presentation of evidence.  For the purpose of this submission, the government will cite to expected stipulations.  Should the parties not reach agreement on any of these facts, the government will enter the evidence through witness testimony and additional exhibits.

1    and Zeng.

2         Soon after the hiring of his replacement, Zeng approached Chau and asked if he could return to

3    his old job.  Zeng stated to Chau that he had "screwed" himself, clarifying that he had never fully

4    secured a position within the Platform group.  Chau indicated to Zeng that it was not possible for him to

5    return, as MZ had filled Zeng's position with another individual.

6         On July 8, 2015, Zeng met with Melissa Lightbody from MZ's Human Resources Department.

7    (Lightbody Testimony.)  Zeng expressed concern to Lightbody that because Zeng had been an employee

8    for under a year, his MZ stock options had not vested.  Accordingly, Zeng wanted to stay at the

9    company or have the company accelerate his vesting.  Lightbody informed Zeng that this was not

10    possible, and that there was no job for Zeng at MZ.

11         On July 9, 2015, from his home in the East Bay, Zeng utilized his MZ laptop to access MZ's

12    internal computer network via the company's VPN.  During this VPN remote session, Zeng accessed

13    MZ's Tableau database, which held a substantial number of sensitive company data files and business

14    analytics reports.  When reviewed later by MZ's IT Department, Tableau and VPN access logs indicated

15    that Zeng's VPN remote session contained substantial activity inconsistent with Zeng's position, his

16    former responsibilities, and the fact that he had separated from the company.  Specifically, in rapid

17    succession Zeng accessed more than 100 Tableau documents.  As MZ administrators will testify, Zeng's

18    activity was inconsistent with routine employee access of the Tableau database; specifically, witnesses

19    will explain that Zeng's activities appeared to indicate that he was opening, accessing and downloading

20    many of the company's most sensitive documents.  As the witnesses will explain, the rapidity with

21    which Zeng accessed the data was inconsistent with normal use of the information.  In the normal

22    course, an employee accessing Tableau pulls open a specific document to work on it or from it and does

23    not access dozens documents in quick and rapid succession.

24         Although Zeng had the capability to access these files in Tableau, witnesses will explain that his

25    access to the Tableau database from home, after he learned his employment would be terminated, not in

26    the course of any project, and in the volume he accessed it raised alarm once the company identified it

27    days later.  Kristen Dumont, the MZ Chief Operating Officer, will explain the importance of the

28

information contained within Tableau.  Tableau contains non-public information ranging from complex company operation analytics to unique data analytics-driven marketing campaigns to specific geographic mobile game downloads and monetization accounting.  Among other information, this data is used to ascertain the amount of Lifetime Value ("LTV") for MZ's customers, broken down by region, demographic, timing and other factors.  MZ's financial success is partly due to the high LTV derived from its customers relative to competing mobile games companies, and this information would allow a competitor to determine, among other things, the optimal amount of marketing expenditures to make in a particular region in order to secure customers and maximize LTV.  Dumont will testify that this information had no relevance to Zeng's job within the Operations group, which concerned data hosting infrastructure, not marketing and sales.

Late in the day on July 9, 2015, MZ set up a meeting with Zeng for July 10, 2015 to discuss his separation agreement.  (Lightbody testimony.)  In the late night and early morning on July 10 while not at MZ's office, Zeng again accessed the Tableau database, this time accessing more than a 100 reports. (Exs. 9-10.)  The company subsequently learned about Zeng's access by pulling Zeng's access records from the company's VPN system logs and Tableau access reports.  (Exs. 8, 9.)  MZ employee Chris Snell will explain the VPN log file, and employee Thai Pham will explain the Tableau access reports.

Zeng met with MZ founder Gabe Leydon, COO Kristen Dumont, and HR representative Melissa Lightbody on July 10 to negotiate a severance package.  In the afternoon of Friday, July 10, the company discontinued Zeng's access to company computer systems and building access.  (Ex. 7.) Shortly thereafter, on July 10, 2015, at 2:17pm, Zeng emailed Lightbody the following message:  "My email and company access seems terminated and not able to go back to the office."  (Ex. 4.)  Early that evening, Lightbody emailed a copy of the Zeng's separation agreement to Zeng's personal email account.  (Ex. 3.)  Lightbody also arranged for Zeng to review his exit paperwork in person on the following Monday or Tuesday.  *Id.*  Zeng never signed the separation agreement that Lightbody sent him on July 10.

On July 15, 2015, Zeng returned his MZ laptop.  (Stipulated.)  Later that day, Anthony Krainer, an employee in MZ's IT department examined the laptop and concluded that it had "been tampered

with." (Ex. 6.)  Krainer will explain that his review of Zeng's MZ laptop revealed that:

(1) MZ's asset tracking program, Meraki,[4] was not on the computer;

(2) Meraki logs showed that the MZ computer last contacted MZ on the morning of July 12;

(3) Meraki's last contact to MZ was from an IP address indicating the contact occurred from Zeng's home;

(4) The computer showed no log history or browsing history prior to the July 12; and

(5) Log files on the computer showed July 12, 2015, as the install date of the operating system, which contrasted with information Krainer had gathered about Zeng's computer in June 2015 showing that the operating system on the MZ laptop had been installed on October 3, 2014.

Krainer will also explain that he could not access the MZ laptop with his administrator credentials, due to the wipe and reinstall, and so he had to create a workaround to gain access to the computer.  Based on his review of the MZ laptop, Krainer recommended that MZ send the computer for further forensic review, which MZ did, sending the computer for testing first by Discovia[5] and then by Stroz Friedberg.  Melanie Maugari, from Stroz Friedberg ("Stroz"), will testify as an expert regarding the forensic review.  Meanwhile, MZ began an internal process of identifying and assessing the damage Zeng had caused, including a review of the information he had accessed, which Kristen Dumont will explain resulted in a significant internal expenditure of resources.  Dumont will explain that MZ was concerned about the information Zeng had taken and was frustrated that his computer wiping prevented MZ from identifying the information and what Zeng had done with it.  For example, once Dumont learned that one of the files located on Zeng's computer was highly sensitive Tableau document, which was not related to Zeng's work at the company (Ex. 33), MZ began the process of determining why Zeng accessed Tableau and what activities he had conducted during that access.

In the course of its internal assessment of damage, MZ collected information from its internal

---

[4] COO Dumont and Krainer will explain that Meraki was the software MZ used to track its company equipment in order to ensure the security of the data on it.  More specifically, Meraki allowed MZ to manage its data and devices and ensure the devices were compliant with security policies.  For example, if an MZ device is in country that MZ deems a security threat, Meraki alerts and allows MZ to lock the device.

[5] Discovia charged MZ just under $4,000 for its forensic evaluation during July 2015.  (Ex. 13A.)

UNITED STATES' TRIAL BRIEF
CR 16-172 JD                                          7

systems, and identified that on July 9 and 10, 2015, Zeng had used the VPN to access Tableau data. (Ex. 8 and 8A.)  In addition, over the course of time, both Discovia and Stroz worked on identifying any data Zeng had and successfully wiped in the course of damaging his computer.  MZ paid significantly more than $5,000 for the forensic evaluation.  That work was done to identify the extent of the damage; specifically, the data impairment caused by Zeng's wiping and reformatting of the computer. Separately, MZ contacted the FBI, which eventually led to the charges in this case.

### C.    Additional Evidence of Zeng's Intent

Additional evidence in the case illustrates that Zeng's actions before July 15, 2015, were part of an ongoing effort – beginning earlier in 2015 and lasting well beyond July 15, 2015 – to replicate MZ's success by starting a new gaming business in China.  When Zeng was arrested at SFO on his way to China on August 20, 2015, the FBI seized several personal devices, including Zeng's iPhone and a laptop.  On the iPhone, the FBI found communications using the application "WeChat."  Two of these communications are particularly probative of defendant's intent.

First, beginning on July 8, 2015, during the period immediately after his resignation from Operations and prior to his formal exit from the company, Zeng communicated using WeChat with an unknown person using the name "gu jun."  In these communications, Zeng provided his restricted internal MZ access credentials to MZ's beta version of its game Mobile Strike, which was not yet publicly available.  Company witnesses will explain the security implications of allowing unknown persons to access internal MZ software prior to its public release, including this.  At the time Zeng was chatting with "gu jun" and providing his internal access credentials, he knew that he did not have a future job anywhere within MZ.

Second, beginning August 7, 2015, Zeng's WeChat communications show his efforts to establish a gaming company in China with a product that Zeng said would be like MZ's Game of War: Fire Age. (Ex 32.)  In a WeChat about establishing this company in China, Zeng writes on August 7, 2015:

> Latest development: I am in talk of collaborations with *tap4fun* (a very successful cell phone games company in Chengdu).  I will help them run operations for the existing games, such that the company may generate revenue on its first day.  They will probably help me develop games to greatly reduce the time required in the development cycle.

UNITED STATES' TRIAL BRIEF
CR 16-172 JD                                8

*Id.* at JZ-00833.  Later in the communications, Zeng references Game of War's forthcoming game, Mobile Strike: "the new game is coming out on the market soon, my cell phone has it…The data is not accurate in this game called appannie, the actual data is better."  *Id.* at JZ-000842.  These communications are direct references to Zeng's knowledge of MZ's confidential customer LTV information contained within Tableau.  As COO Dumont will explain, Tableau contains the information that would enable a company to, in Zeng's words, "generate revenue on its first day."  Zeng was not involved with sales and marketing at MZ.  The Tableau documents he accessed concerned precisely this information regarding how MZ has succeeded at revenue generation.[6]  Similarly, when Zeng said: "the actual data is much better" he clearly meant that the publicly available data on "appannie" is less compelling than what he saw in Tableau.

In addition, on Zeng's personal laptop, the FBI located a PowerPoint presentation created by Zeng which appears to be a pitch presentation to potential investors for a company Zeng wanted to start with Meng Shi, a former classmate from Jiao Tong University in the PRC.  The PowerPoint is titled: "Dracaena: Big Data Analytics" and is dated August 1, 2015.  In the presentation, Zeng describes a gaming company that he has created with a focus on mining and generating data.  In the presentation, Zeng likens his company to MZ and indicates that there is no game currently available in the PRC which is comparable to MZ's Game of War: Fire Age.  Zeng makes similar points in additional WeChat conversations during August 2015, which further show his effort to establish a gaming company in China.

### D.    Zeng's Recorded Interview with CEO Leydon

In August 2015, after he returned from China, Zeng requested a one-on-one meeting with the Founder/CEO of MZ, Gabriel Leydon.  Leydon agreed to meet Zeng at a restaurant in Palo Alto on August 17, 2015.  The meeting, which lasted approximately 45 to 50 minutes, was observed and recorded by the FBI.  (Ex. 22.) During the rambling and often confusing conversation, Zeng indicates that he has retained electronic documents, which belong to MZ.  Zeng admitted to Leydon: "And then I

---

[6] The FBI found a MZ marketing and sales strategy document in Zeng's home during a search in August 2012.  (Exhibit 24.)  Witnesses will explain that this type of marketing document was not one that Zeng needed in the course of his work at MZ.

1  did copy screen that day."  *Id.* at 33.  Leydon responds that the documents retain substantial value to

2  MZ, (*id.* at 36) and that it is critical to the company that Zeng either return the documents or provide

3  proof that he has deleted all of the documents.

4       Zeng agrees to return the documents, at one point offering to mail them to Leydon from China

5  and then later seemingly offering to provide them to a third-party company which could conduct a

6  forensic review.  In return, Zeng negotiates a severance package from MZ, which will provide him with

7  additional benefits, to include an ability to vest his substantial stock options without having to complete

8  12 months of employment, as is required of other employees:

9       GL: In exchange … Six Months … Seven months equity. And you're
       saying in exchange you'll give me the drive …Well you'll take the drives
10      to a forensics person.  You don't even have to see me again. I just want to
       know that those things got deleted like your … And I want to know that
11      you're telling me the truth.  Huh?  JZ:  Yeah.  GL: Yes?  JZ: Yeah.

12  *Id.* at 43.  Despite this agreement on August 17, 2015, Zeng has made no effort to return the USB drives

13  he used to copy sensitive MZ electronic data to MZ or a third-party forensic review company.

14      **E.  Expert Testimony**

15      The government timely disclosed Stroz Friedberg's expert testimony.  The parties have also

16  agreed that Stroz's reports are admissible in this bench trial.  The Court can reference Stroz's final report

17  at Exhibit 19.

18      In summary, Stroz is expected to explain based on its forensic review of the laptop:

19      • A new operating system was installed on July 12, 2015 at 3:43 PM.

20      • Stroz could not recover latent files that existed on the laptop before the install date.

21      • Stroz identified 175 files that were added to the "documents" directory on the laptop on

22        July 15, 2015.

23      • Google searches on July 15, 2015 at approximately 10AM[7] showed two searches: (1)

24        "how to check whether my mac is reformed;" and (2) "how to check whether my laptop

25        is reformed."

26      • A wipe and reinstall of a product like the MZ laptop required a series of steps, including

27

28      ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
        [7] Zeng handed in the MZ laptop later that morning.

1   access to software from an external source, either via the Internet or from an external

2   drive.

3   MZ also provided Stroz with the Tableau and VPN logs, and Stroz assessed those, concluding that:

4   • Zeng used his company accounts to access Tableau from an IP address associated with

5   Zeng's home.  (The FBI will also testify about the subpoena to Comcast to verify this

6   conclusion.)

7   • VPN and Tableau logs show high activity from late night on July 9, 2015 to July 10,

8   2014.  The VPN logs show data downloaded through the VPN to the laptop.

9   ## II.   THE EVIDENCE PROVES EACH ELEMENT BEYOND A REASONABLE DOUBT

10   Title 18 U.S.C. Section 1030(a)(5)(A) provides:

11   Whoever . . . knowingly causes the transmission of a program,
information, code, or command, and as a result of such conduct,

12   intentionally causes damage without authorization, to a protected
computer . . . shall be punished as provided in subsection (c) of this

13   section.

14   18 U.S.C. § 1030(a)(5)(A).

15   The parties agree that Zeng's Mac laptop computer is a "protected computer."  (Joint

16   Stipulations.)  The evidence establishes the remaining elements by proof beyond a reasonable doubt.

17   ### A.   The Evidence Establishes that Zeng Knowingly Transmitted a Code or Command.

18   In order to wipe and reinstall the MZ laptop, Zeng transmitted a code or command.  In fact, he

19   transmitted many.

20   In *International Airport Centers, LLC v. Citrin*, 440 F. 3d 419 (7th Cir. 2006), the Seventh

21   Circuit court interpreted the word "transmission" in 18 U.S.C. § 1030(a)(5).  The parties agree that this

22   case provides the essential authority regarding this element.  *Cf.* Def. MTD Dkt. 44 at 11.

23   In *Citrin*, Judge Posner applied the CFAA in a case in which the defendant's former employee

24   (Citrin) deleted the data from a company-loaned laptop:  "not only the data that he had collected but also

25   data that would have revealed to [the company] improper conduct in which he had engaged before he

26   decided to quit."  440 F.3d at 418.  Citrin loaded a secure-erasure program to the laptop, which wrote

27   over the deleted files to prevent their recovery.  The court of appeals rejected the defendant's contention

28

that erasing a file did not constitute damage and held that the transmission of the secure-erasure program

to the computer was a transmission:

> There is more here, however: the transmission of the secure-erasure program to the computer.  We do not know whether the program was downloaded from the Internet or copied from a floppy disk (or the equivalent of a floppy disk, such as a CD) inserted into a disk drive that was either inside the computer or attached to it by a wire.  Oddly the complaint doesn't say; maybe IAC doesn't know—maybe all it knows is when it got the computer back, the files in it had been erased…but we don't see what difference the precise mode of transmission can make.  In either the Internet download or the disk insertion, a program intended to cause damage…is transmitted electronically.

*Id.* at 419.  Although the Court noted that there was a contextual difference between a transmission that

requires physical access to the computer and one through the Internet, the Court rejected the position

that Congress was concerned with the remote attack and not the inside attack:  "Congress was concerned

with both types of attacks."  *Id.*[8]

The facts at trial, including through the testimony of an expert witness, Melanie Maugeri, from

Stroz, will establish that on July 12, 2015, Zeng transmitted a series of codes or commands to the MZ

laptop, which first wiped the laptop and then reinstalled the Apple operating system.

Maugeri will walk the Court through the process by which an Apple MacBook like the MZ

laptop can be wiped.  As Maugeri will explain, the MZ laptop had a solid state drive.  The government

expects her to explain that while that process to wipe the MZ laptop can be done without an Internet

connection, the next step – the reinstallation – requires an external source, the Internet or otherwise.[9]

For that process, Maugeri will explain, based on her forensic review and knowledge of similar products,

that the user of the laptop likely used the laptop's built-in "recovery" mode and thereby accessed the

Internet to install the current Apple operating system, which was "Mac OS X."  Maugeri will walk the

Court through this process, establishing that the user of the laptop would have transmitted codes and

---

[8] Although *Citrin* was a civil case, Judge Posner was cognizant that § 1030(a)(5) could be charged criminally as well and made clear that the court of appeals was interpreting the statute in anticipation of its application in a criminal prosecution.  *Id.* at 419.

[9] *Citrin* does not require an internet connection.  Judge Posner was clear that this was not an internal or external question but an "electronic" one.  Instead, the Court left open the possibility that "pressing a delete or erase key" might stretch the statute too far but concluded that the evidence, established "more."  *Citrin*, 440 at 419.

1  commands at several steps to download and reinstall the operating system.  We expect that Maugeri will

2  explain that in order to reinstall the then-current version of OS X, an external device or connection was

3  required.  She will also explain that the forensic evidence shows that after initial reinstallation, the user

4  upgraded the operating system from OS X 10.9.2 to OS X 10.9.5, which likely occurred through the

5  internet.  In short, this portion of the testimony will show that the process of wiping and reinstallation

6  was an interrelated series of commands.

7         Earlier in this case, defendant asked the Court to dismiss this count on the basis that *Citrin*

8  provides that hitting delete is not enough.  Dkt. 44 at 12.  *Citrin* does not, in fact, hold that hitting delete

9  is not enough.  It suggests that it may not be enough, particularly in the criminal context, but it did not

10  decide that issue.  This Court also does not need to decide the issue because there is significantly more

11  here.  The Superseding Information does not allege that the damage lies only in the wiping, but in the

12  process of wiping *and reinstalling*:

13         Before Zeng returned the Mac laptop to Machine Zone, through the
           transmission of computer codes and commands, Zeng damaged the Mac
14         laptop by intentionally causing the contents of the mac laptop to be erased,
           thereby altering and transferring the software on the computer.  Thereafter,
15         Zeng further damaged the Mac laptop by reformatting it, installing on it an
           operating system other than that which was installed by the company…

16

17  Dkt. 53 Superseding Information at ¶ 7.  The evidence will establish this series of transmissions.

18  Maugeri will explain that the wiping and reinstalling occurred through a series of interrelated processes.

19  Throughout that transmission, there were a series of codes and commands, all of which satisfy the

20  transmission element.

21         In moving to dismiss, defendant also argued that Congress did not mean the CFAA to reach

22  Zeng's conduct but to reach transmission by computer viruses or similar programs.  Dkt. 44 at 11.

23  *Citrin* rejected that notion, with Judge Posner writing explicitly that Congress intended the statute to

24  reach an insider attack.  440 F.3d at 420; *see also KLA-Tencor Corp. v. Murphy*, 717 F. Supp.2d 895,

25  903 (N.D.Cal. 2010) (loading of a program on computer by disk or Internet by employee constitutes

26  transmission).  Like Citrin, who deleted data on his computer that would have revealed his conduct,

27  Zeng wiped his laptop through the transmission of codes and commands.  And addressed below, like

28

UNITED STATES' TRIAL BRIEF
CR 16-172 JD                                          13

Citrin, Zeng's transmissions were intended to hide conduct of which he did not want MZ to learn.

Zeng knew that he was transmitting codes and commands.  First, he necessarily transmitted a series of codes and commands in the course of wiping and reinstalling his computer, which required navigating through numerous prompts and related steps, and so there is no basis to argue that he accidentally or by mistake hit a delete key or otherwise did not know what he was doing.  If any question remains about his state of mind, Zeng himself answers it:  shortly before returning the MZ laptop, Zeng ran two Google searches that end any dispute about whether he knew the consequence of the transmissions he caused.  Specifically, in the morning on July 15, 2015, queries:  "how to check whether my mac is reformed" and (2) "how to check whether my laptop is reformed." (Ex. 19 p. 3.)

**B.**     **The Evidence Establishes that Zeng Intentionally Caused Damage Without Authorization.**

       **1.**     **Zeng Damaged the Machine Zone Laptop.**

The statute defines damage as "any impairment to the integrity or availability of data, a program, a system, or information." 18 U.S.C. § 1030(e)(8).  Under the plain language of the statute, Zeng's conduct constitutes damage because he impaired the integrity and availability of data, including MZ programs, systems, and information.  Specifically, Zeng's actions:  (1) impaired programs that Zeng could not install on his computer because he did not have access, including the Meraki program, an asset-tracking program that allowed MZ to determine, for example, if the MZ laptop had been taken outside of the country without authorization; (2) prevented MZ from being able to access the MZ laptop using normal procedures (i.e., the administrator credentials that were erased when Zeng wiped the laptop); and (3) impaired the availability of log files and other information kept only on the MZ laptop and nowhere else.

In addition to the impaired data about which MZ knows, the evidence also establishes that Zeng's wiping of the MZ laptop was so effective that nothing was left on it from before July 12, 2015. The effective wiping prevents either MZ or the government from knowing what data was on the laptop before July 12 to know precisely what data Zeng impaired.  But the Court does not need to speculate

about what Zeng had on the MZ laptop before he wiped it,[10] because the evidence establishes loss of data that satisfies the plain language of the statute, some of which MZ could recover (the Meraki system itself) and some of which MZ could not (critical log files stored only on the MZ laptop).

Witnesses Anthony Krainer and Melanie Maugeri will present the primary evidence of damage. Anthony Krainer's email to MZ on July 15, 2015, in which Krainer identified evidence that Zeng had "tampered" with the MZ laptop (Ex. 6), establishes that Zeng's wiping and reinstall had the effect of deleting the software, Meraki, which MZ uses to identify, monitor, and protect its equipment.  In addition, Krainer will explain the process he was required to undergo to access the computer.  Krainer is expected to explain that because Zeng did not have access to specific software installation packages used by MZ, Zeng could not reinstall the MZ laptop with specific company software, including Meraki. As a result:  (1) software including the Meraki program was not on the MZ laptop; and (2) Krainer and the IT department could not access the computer with their administrator credentials (because, in the process of wiping and reinstalling the MZ laptop, Zeng caused these credentials to be destroyed), and instead had to create a "workaround" for accessing the computer.  Krainer will also explain that when he eventually did access the computer, he identified that the log files only showed actions starting July 15, 2015.  Krainer, though, knew that prior to Zeng's wiping, the log files would show actions from other days.  Krainer knew that because, at the request of COO Dumont, in mid-June 2015, Krainer remotely accessed the MZ laptop and observed log files which were not present on the laptop when Zeng returned it to MZ.  *Id.* (screen shot of certain log files).  Krainer did not keep a record of all the log files.  Based on her examination of the forensic image of the computer and log files provided by MZ to Stroz, Maugeri will also testify about the loss of data.

The evidence therefore establishes loss of data in two forms.  First, MZ lost programs that Zeng wiped from the computer that he did not (and could not) reinstall.  Second, MZ lost information that was stored only on the MZ laptop, such that when Zeng wiped the laptop, the data no longer existed.  Both

---

[10] Although the Court does not need to consider what data Zeng had and what he hid, testimony from MZ witnesses will demonstrate the company's concern on July 15, 2015  and in the days following that Zeng still had the information he had accessed through Tableau and was using, selling, or otherwise misappropriating it.  And Zeng himself, during the recorded interview with CEO Leydon admitted that he had company information on USB drives at home and in China.

1  suffice under the plain language of the statute.[11]

2      Defendant, though, contends that there is no damage under the CFAA because there is no

3  permanent loss of data.  The evidence defeats this argument.  Defendant damaged systems that MZ put

4  on the computer, and he also damaged information about the computer's digital footprint (log files)

5  stored only on the MZ computer. Therefore, cases that defendant has previously cited to this Court at the

6  motion to dismiss stage for the proposition that the allegations did not sufficiently plead damage also fail

7  at this stage.

8      Defendant's reliance on *Custom Packaging Supply, Inc.*, *v. Phillips*, 2016 WL 153220 at *4

9  (E.D. Cal., April 15, 2016), does not help defendant at this stage any more than it did earlier in the case.

10  There, the court dismissed allegations as insufficient where they did not allege that defendant "damaged

11  any systems or destroyed any data as a result of his conduct."  *Id.*  The evidence the Court will hear in

12  this case establishes damages to systems (Meraki, the administrator access) and data (log files on the

13  computer, browsing history, as well as data Zeng had and did not replace).  Although it is true that MZ

14  could have put Meraki back on the computer such that there was no permanent damage to Meraki

15  itself,[12] there was loss of data tracked by the Meraki software that could not be recreated or discovered.

16  Thus, cases where an employee accessed data that was otherwise available elsewhere are not on point.

17  *Cf. Condux Intern., Inc.*, *v. Haugum*, 2008 WL 524418 at *7 (D. Minn. 2008); *Lockheed Martin*

18  *Corporation v. Speed*, 2006 WL 2683058, at *7-8 (M.D. Fla. August 1, 2006).

19                    **2.    Zeng Intended to Cause Damage.**

20      Zeng's conduct in the days between July 8, 2015 and July 15, 2015 shows a series of events that

21  establish his intent to damage the MZ laptop:

22          • July 8 at MZ:  Zeng approves a replacement for his role in Operations, and meets with

23  ─────────────────

24  [11] As the plain language of the statute makes clear, damage includes "*any* impairment to the
   integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8) (emphasis
25  added).  Thus even though MZ could reinstall the Meraki software and other programs on the MZ laptop
   after Zeng returned it, the deletion of those programs are damage within the plain language of the
26  statute.  *See also Aquent L.L.C. v. Stapleton*, 65 F. Supp. 3d 1339. 1345 n.7 (M. D. Fl. 2014) (statute
   does not require data to be lost permanently).

27  [12] Zeng's actions did not destroy the Meraki system itself, but his deletion of the program on the
   MZ laptop meant that data that Meraki would have gathered about the computer's status during the
28  period after Zeng wiped and reinstalled the MZ laptop on July 12 was not and never would be available.

Human Resources, which informs him that given that he resigned from his assignment, he will need to exit the company.

- July 8 at Zeng's home during the night/early morning: Zeng (1) accesses Tableau documents (Ex. 9-10); (2) WeChats with persons in China, providing his company credentials to allow them to access the beta version of the new game MZ was testing (Ex. 31 at JZ-000802).

- July 9:  Meeting scheduled for July 10 to discuss his exit from the company.

- Late night July 9/early morning July 10:  Zeng logs in to MZ systems through the VPN and accesses more than 100 sensitive Tableau documents (Ex. 8, 8A).

- July 10 late morning:  Meeting at MZ regarding Zeng's exit.

- July 10 afternoon:  MZ terminates Zeng's email account and VPN access (Exs. 4, 7).

- July 10 early evening:  Zeng receives a separation agreement from MZ at his personal email address (Ex. 3).

- July 11:  Zeng emails MZ regarding separation agreement.  (Ex. 3 at JZ-00360.)

- July 12:  Zeng emails MZ requesting more time to review separation agreement.  *Id.*

- July 12 at 3:42PM:  Meraki shows last contact from the MZ laptop to the Meraki system. (Ex. 6.)

- July 12 at 3:43 PM:  New operating system installed on the laptop.  (Ex. 6, 19 at 1.)

- July 15:
  - 10AM:  175 files are added to the laptop from an external source. (Ex. 19 at 2.)
  - 10:05AM:  Zeng Googles "how to check whether my laptop reformed." *Id.* at 3.
  - Approximately 10:30AM:  Zeng returns the laptop.

In short, the evidence shows Zeng's efforts to gather confidential company information and then wipe the computer.  On the day the company required him to return the MZ laptop, Zeng ran a Google search that, standing alone, shows that he intended to reformat his computer.  At the same time, he placed files back on the MZ laptop in an apparent attempt to obscure his actions.  Of course, only Zeng knows what external device he used to copy those files back to the MZ laptop, or whether he actually possessed more

than 175 files, some of which he did not put back on the computer.  Zeng told CEO Leydon that he had

drives with company property on them in the United States and in the PRC, but Zeng never returned

these drives to MZ.  (See Ex. 22 p. 47: "JZ: No, so I think most likely it's in my bag in China, so maybe

I have [to] mail each three. I will check my bag and … Okay?  Make sense?  GL: Yeah, yeah, yeah …".)

### 3.    Zeng Was Not Authorized to Damage the MZ Computer.

The statute requires that the damage occur "without authorization."  As much as defendant

would like to shoehorn this case in to the *Nosal* framework, the *Nosal* framework simply does not apply

here.  Unlike *Nosal I*, which involved a charge that the defendant "exceed[ed] authorized access" under

§ 1030(a)(2)(C), Zeng is charged under § 1030(a)(5)(A), which does not include the "exceeding

authorized access" language that was at issue in *Nosal I*.  *Nosal* therefore does not address this provision

of the CFAA, or the situation here where Zeng expressly did not have authorization to undertake certain

actions on a computer that belonged to his employer.

The evidence establishes that Zeng damaged his computer without authorization.  When he

accepted the MZ laptop, he agreed in writing that he would not "alter the equipment or change the use

for which it was intended."  Ex. 1.  He also agreed that "software shall not be altered, copied, added or

transferred at anytime, unless authorized by a manager or the IT Department."  *Id.*

There is more here, too, than Zeng's agreement.  Zeng indisputably knew that he no longer had

*any* authority to access to MZ systems or MZ itself.  On July 10, 2015, at 2:17pm, Zeng emailed Melissa

Lightbody:  "My email and company access seems terminated and not able to go back to the office."

After that, he wiped and reformatted his MZ-issued laptop computer.

The argument that Zeng was still an employee because his severance agreement – which he

never signed – said that July 31, 2015, was his "termination" date, does not advance the conclusion that

he was an employee and therefore was authorized to damage his computer.  As an employee, Zeng was

not authorized to damage his laptop, pursuant to the agreement he signed.  Regardless of whether his

employment status was now "separated" or "terminated" or something else,[13] Zeng knew that he was not

---

[13] His separation agreement was clear that Zeng was not to permit any services for MZ after July
10.  Ex. 3 at JZ-00363.

1  authorized to damage his computer.  He also knew that he no longer had access to MZ systems, and so

2  there was no way for him to work, regardless of whether he was on the payroll or not.  Thus, regardless

3  of his status with the company, Zeng agreed not to take the actions he did, thus making the legal

4  question of authorization straightforward.

5        **C.**    **The Evidence Establishes Loss Sufficient to Trigger a Felony.**

6        A violation of the statute is a felony under 18 U.S.C. § 1030(a)(5)(A) when it causes loss of

7  more than $5,000.  Under 18 U.S.C. § 1030(e)(11), loss is "any reasonable cost to any victim, including

8  the cost of responding to an offense, conducting a damage assessment, and restoring data, program,

9  system or information to its condition prior to the offense, and any revenue lost, cost incurred, other

10 consequential damages incurred because of interruption of service."  MZ is the victim in this case, and

11 the evidence establishes far more than $5,000 in internal and external costs to MZ to conduct a damage

12 assessment.  Testimony from COO Kristen Dumont will establish the internal expenditures, and invoices

13 from Stroz together with COO Dumont's testimony will establish money spent by MZ on forensic

14 consultants.

15       These expenses qualify as loss.  In *Animators at Law, Inc. v. Capital Legal Solutions, LLC,* 786

16 F. Supp. 2d 1114 (E.D. Va. 2011), the court concluded at the summary judgment stage that a jury could

17 find that the victim "acted reasonably in ordering an in-depth investigation complete with forensic

18 analysis of the misappropriated laptop."  *See also KLA-Tencor Corp. v. Murphy,* 717 F. Supp. 2d 895,

19 903 (N.D. Ca 2010) (forensic review a qualifying loss).

20       The internal expenses also qualify.  *See, e.g., United States v. Middleton*, 231 F.3d 1207, 1214

21 (9th Cir. 2000) (holding under a prior version of the CFAA that it is permissible for the district court to

22 compute "loss" based on the hourly wage of the victim bank's employees) (*citing United States v.*

23 *Sablan*, 92 F.3d 865, 869 (9th Cir.1996); *see also Global Policy Ptnrs, LLC v. Yessin,* 686 F. Supp. 642,

24 651 (E.D. Va 2010) (lost revenue damages quantified by time employees spent responding to an offense

25 qualify).

26       In earlier motions before the Court, defendant has cited *Middleton* for the proposition that MZ's

27

28 UNITED STATES' TRIAL BRIEF

1  expenses were not reasonably foreseeable to defendant.[14]  Having known that he had altered his

2  computer, it would be reasonably foreseeable to Zeng that MZ would have costs associated with

3  remediating his actions, including investigation of whether his "reforming" disguised any improper

4  conduct.  Particularly in MZ's security conscious environment, in which MZ installed a software system

5  (Meraki) precisely to track the security of its devices, Zeng could hardly believe that MZ would simply

6  ignore his actions.  Taking only the invoice Stroz sent to MZ for July and no other is sufficient to

7  establish loss exceeding the threshold in the statute and the necessity of MZ's actions in response to

8  Zeng's conduct.

9      The July invoice from Stroz to MZ shows Stroz's initial forensic work investigating the extent of

10  damage based on any evidence that could be gathered from the computer.  (Ex. 13 p. JZ-00682.)  The

11  invoice includes a billing entry on July 20, 2015, for reviewing the MZ laptop, understanding MZ

12  systems, and processing the forensic data on July 20, 2015, totaling $4,461.25.  *Id.*  Further, billing

13  entries for the following day, which cost MZ an additional $1,867, included "review local systems logs,

14  perform USB analysis, carve and review unallocated space, review enterprise logs."  *Id.*  The work in

15  July alone resulted in fees to MZ of at least $32,632.00, *id.* at JZ-000689, and the work was not yet

16  complete.  The forensic and other work by MZ, Stroz and the company to evaluate the extent of damage

17  was necessary, and it was foreseeable to Zeng.

18  **III.  DISPUTED EVIDENTIARY ISSUES**

19      **A.    Evidence Regarding Zeng's Efforts to Start a Gaming Company in China, Before
20            and After July 15 2015, are Relevant to Intent.**

21      Defendant objects to admission of any events or conversations involving defendant and others

22  occurring after July 15, 2015, on the basis that they are not admissible at trial because they are "other

23  acts" evidence within the meaning of Fed. Rule. Evid. 404(b).  In addition, defendant appears to contest

24  the admissibility even of conversations he had regarding MZ with persons in China that occurred prior

25  to July 15, 2015.

26

27      ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
      [14] *Middleton* pre-dates the current statutory language regarding loss, and the statute itself does
      not require that the costs be reasonably foreseeable.  Regardless, these costs were reasonably foreseeable
28  to defendant, who knew precisely what he had done.

UNITED STATES' TRIAL BRIEF
CR 16-172 JD                    20

The evidence at issue is: (1) conversations defendant had with persons using WeChat before July 15, 2015, in which defendant provided his MZ credentials to unknown persons in the PRC; (2) conversations defendant had with persons using WeChat after July 15, 2015, regarding his efforts to establish a gaming company in China; and (3) the Dracaena PowerPoint presentation seized by the FBI during his arrest and dated August 1, 2015.

### 1.      WeChats Before July 15, 2015

Conversations Zeng had using WeChat with persons in China in which he, contemporaneous with his exit from MZ, sent MZ information to China using his personal phone, are inextricably intertwined with the charged conduct.  More specifically, in a WeChat conversation on July 8 and 9, 2015 and running through July 13, 2015, after Zeng knew that he no longer had a role at MZ,  Zeng provided his MZ access credentials to individuals in China so that they could access the beta version of Mobile Strike, MZ's forthcoming game.  (Ex. 32.)  The time stamps on the WeChats show Zeng conversing at approximately the same that he, from home, accessed Tableau data after learning that MZ intended to exit him from the company.   The conversation continued through July 13, 2015, after Zeng's exit from the company.

The government is required to prove both that Zeng acted knowingly in transmitting codes and commands and that he intended to damage the computer.  These WeChats occurred at the same time as the actions in this case, and are directly relevant to his intent when he took the actions.  Because they are intertwined with the charged conduct, they are admissible.  *United States v. Soliman*, 813 F.2d 277, 279 (9th Cir. 1987) (distinguishing "other acts" evidence from inextricably intertwined evidence).

### 2.      WeChats After July 15, 2015, and the Dracaena Powerpoint

WeChat communications Zeng had in the weeks following his exit from MZ and the PowerPoint presentation he created and dated August 1, 2015, regarding starting a gaming company in China are also admissible because they are relevant to defendant's state of mind, and they also are not "other act" evidence.

 The government intends to introduce three WeChat communications that Zeng had with individuals in China from August 6, 2015 through August 20, 2015, (Exs. 427-29) and the Draecaena

1   PowerPoint presentation that he created on August 1, 2015 (Ex. 21).  The evidence establishes that Zeng

2   accessed sensitive company data after he knew that he would no longer have a job at MZ.  This evidence

3   goes to Zeng's motives to access data while at MZ and then hide that conduct through the wipe and

4   reinstall.

5        The WeChat communications and the Draecaena PowerPoint are not other crimes or wrongs

6   falling within Rule 404.  There is no possibility that the fact-finder[15] could confuse them as a wrong or

7   crime.  They are admissible because they are relevant and probative of defendant's motive and intent

8   when he committed the charged act.[16]

9        **B.    Defendant Cannot Call an Expert Given His Failure to Comply with Rule 16.**

10       The Court should preclude defendant from presenting any expert testimony because he failed to

11  comply with Rule 16.  The government has and continues to comply with its discovery obligations.

12  With respect to expert testimony, the government timely produced the reports prepared by Stroz

13  Friedberg, supplemented those with a written summary of additional points the expert is expected to

14  testify regarding at trial, and provided the *curriculum vitae* of the expert witness.  To date, defendant has

15  not produced any discovery, regarding experts or otherwise, and the government has asked for it.

16  Because the defense has failed to fulfill its obligations under Rule 16(b)(1)(C)(i), the Court should

17  exclude any expert testimony offered by the defendant, both in his case-in-chief or used in "rebuttal."

18       Defendant cannot evade his obligations by purporting to preserve an undisclosed expert witness

19  in order to "rebut" the government after it rests. *Melgar v. Zicam LLC*, No. 2:14-CV-0160 MCE AC,

20  2015 WL 5255391, at *2 (E.D. Cal. Sept. 9, 2015) (noting that rebuttal witnesses should not be used as

21  "supplemental designations" to the case-in-chief or for issues that should have been anticipated as part

22  of the opposition's case-in-chief).  *Melgar*, in analyzing the language of a pre-trial order concerning

23

24       [15] Because there is no jury and no danger of confusion of issues, it is particularly apparent that
the Court should assess all of this evidence based on relevance, and not Rule 404(b).

25

26       [16] The government provided notice that it intended to admit WeChat communications and the
PowerPoint by providing an early draft of an exhibit list and subsequent notice, stating that these do not
27  fall within the ambit of Rule 404(b) but are admissible even under the rule.  The evidence of the
communications, even if considered "other acts" is admissible pursuant to Rule 404(b) as evidence of
intent and motive and occurring soon after the charged conduct.  *See United States v. Verduzco*, 373
28  F.3d 1022, 1027, 1029 (9th Cir. 2004).

1  witness designation, underscored the impropriety that a party would "withhold experts needed for its

2  case-in-chief during initial disclosures, and then try to 'back-door' them as rebuttal witnesses." 2015

3  WL 5255391, at *2.

4     The government has made the defendant aware of its intention to use an expert witness as a part of

5  its case-in-chief. The defendant may anticipate and respond to the government's arguments in his own

6  case-in-chief, including through an expert witness, only if he complies with Rule 16(b) of the Federal

7  Rules of Criminal Procedure, by disclosing such a witness before trial. However, he cannot "back-door"

8  his expert by withholding that testimony for anything other than his case-in-chief. The defendant's case-

9  in-chief is his "rebuttal" opportunity. Therefore, waiting to provide witnesses until after the government

10 rests, based on the assertion of a "rebuttal" argument, is improper, prejudicial, and risks delaying the

11 trial.

12 **IV.    PRETRIAL CONFERENCE STATEMENT**

13     **A.    Disclosures (Crim. L.R. 17.1-1(1)-(3))**

14     The government has disclosed all statements or reports of witnesses, and there is no grand jury

15 testimony of witnesses who will be called at trial.

16     As of this date, the United States is not aware of any material exculpatory or impeachment

17 information concerning the witnesses expected to testify in its case in chief that would be subject to

18 disclosure pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150

19 (1972), and *United States v. Henthorn*, 931 F.2d 29 (9th Cir. 1991).

20     The United States believes that it has supplied all materials that may be relevant as *Brady*

21 material, if any, and recognizes its obligation to continue to provide any such materials within its

22 possession, custody, or control. The United States will produce any material for which disclosure is

23 mandated under the Jencks Act, 18 U.S.C. § 3500 in advance of trial.

24     In preparing for trial, the government is continuing to interview witnesses and obtain additional

25 evidence. The government recognizes and will comply with its ongoing obligation to provide the

26 defense with materials subject to *Jencks*, *Brady*, and *Giglio*, as well as its continuing duty to comply

27 with Rule 16.

28     **B.    Stipulations (Crim L.R. 17.1-1(b)(4))**

1       The parties are working towards stipulations regarding certain elements, facts, and the

2   admissibility of evidence.  It is the government's intention to file those prior to July 6, 2017.

3       **C.**    **Need for Interpreters (Crim. L. R. 17.1-1(b)(5))**

4       The United States does not intend to offer any testimony by non-English speaking witnesses.

5       **D.**    **Dismissal of Counts/Elimination of Issues (Crim L.R. 17.1-1(b)(6))**

6       The government moved to dismiss Counts Two and Three of the Superseding Indictment, and

7   the Court granted that motion.  The government will proceed on Count One.

8       **E.**    **Joinder/Severence (Crim. L.R. 17.1-1(b)(7))**

9       There are no joinder or severance issues.

10      **F.**    **Informants, Identification Issues, Prior Convictions (Crim. L.R. 17.1(b)(8))**

11      There are no issues relevant to informants, identification, or prior convictions.

12      **G.**    **Pretrial Exchange of Witnesses and Documents (Crim. L.R. 17.1(b)(9-10))**

13      The government has not received any discovery from the defense.  The government will move to

14  exclude any evidence offered by the defendant in his case-in-chief that is not produced prior to trial.  *See*

15  *United States v. Scholl*, 166 F.3d 964, 972 (9th Cir. 1999) (affirming district court's exclusion of checks

16  that were not produced by defendant to the government prior to trial); *United States v. Nash*, 115 F.3d

17  1431, 1439-40 (9th Cir. 1997) (affirming exclusion of defense expert who was not properly disclosed

18  pursuant to Fed. R. Crim. P. 16(b)(1)); *United States v. Aceves-Rosales*, 832 F.2d 1155 (9th Cir. 1987)

19  (per curiam) (affirming district court's exclusion of medical report not produced by defendant).

20      **H.**    **Objections to Exhibits Or Testimony (Crim. L.R. 17.1(b)(11))**

21      On June 12, 2017, the government provided, via email, a witness list and draft exhibit list to

22  defendant.  On June 16, 2017, the government provided sections of a recorded meeting between Zeng

23  and the Founder/CEO of MZ, Gabriel Leydon, which it may use at trial.

24      **I.**    **Legal Issues Likely to Arise at Trial (Crim L.R. 17.1-1(b)(12))**

25      The government is not aware of any legal issues likely to arise at trial, outside of those addressed

26  in the parties' trial briefs.

27      **J.**    **Scheduling (Crim. L.R. 17.1-1(b)(13))**

28

1   There are no scheduling issues that impact witnesses or the Court.

2   **K.      Jury Voir Dire and Jury Instructions (Crim. L.R. 17.1-1(b)(14))**

3   There are no issues, as this is a bench trial.  The government has briefed the legal standards

4   relevant to the charged conduct.

5   DATED: June 26, 2017                        Respectfully submitted,

6                                               BRIAN J. STRETCH
                                                United States Attorney
7
                                                      /s/
8                                               _____
                                                JOHN H. HEMANN
9                                               JOSEPH E. SPRINGSTEEN
                                                LAURA VARTAIN
10                                              Assistant United States Attorneys

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28