DENNIS P. RIORDAN, CA Bar No. 69320
   dennis@riordan-horgan.com
**RIORDAN & HORGAN**
523 OCTAVIA STREET
SAN FRANCISCO, CA 94102
TELEPHONE:  415.431-3472
FACSIMILE:   415.552.2703

THOMAS F. CARLUCCI, CA Bar No. 135767
   tcarlucci@foley.com
JAIME DORENBAUM, CA Bar No. 289555
   jdorenbaum@foley.com
**FOLEY & LARDNER LLP**
555 CALIFORNIA STREET
SUITE 1700
SAN FRANCISCO, CA 94104-1520
TELEPHONE:  415.434.4484
FACSIMILE:   415.434.4507

Attorneys for Defendant
JING ZENG

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR 16-00172 JD |
| Plaintiff, | ) **ZENG CLOSING ARGUMENT** |
| vs. | ) Judge: Honorable James Donato |
| JING ZENG, | ) |
| Defendant. | ) |

4817-9438-3183.1

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

    A.    MZ and Zeng Separate .......................................................................................... 2

    B.    The Alleged Wrongful Conduct ........................................................................... 3

    C.    The Process of Erasure .......................................................................................... 4

    D.    MZ's Response to the Erased Laptop ................................................................... 5

    E.    The Erased Information as "Damage" ................................................................. 6

    F.    The Tableau Data Accessed by Zeng .................................................................. 7

ARGUMENT ............................................................................................................................ 8

I.    THE GOVERNMENT FAILED TO PROVE THE TRANSMISSION ELEMENT ......... 8

    A.    The Requirement of External Transmission ........................................................ 9

    B.    Zeng's Acts Erasing the Laptop ........................................................................ 10

    C.    Internal Transmission ......................................................................................... 11

    D.    Course of Conduct ............................................................................................. 12

II.    THE GOVERNMENT FAILED TO PROVE THE DAMAGE ELEMENT ........................ 14

III.    THE GOVERNMENT FAILED TO PROVE THE INTENT ELEMENT ............................ 16

IV.    THE RULE OF LENITY AND CONSTITUTIONAL AVOIDANCE .................................. 18

CONCLUSION ....................................................................................................................... 20

4817-9438-3183.1

1

2

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

3

**Federal Cases**

4

*Asgrow Seed Co. v. Winterboer*,
  513 U.S. 179 (1995)..................................................................................................13

*Burrage v. United States*,
  134 S. Ct. 881 (2014).............................................................................................13, 14

*Dedalus Found. v. Banach*,
  No. 09-CV-2842, 2009 WL 3398595 (S.D.N.Y. Oct. 16, 2009).......................................10

*Grant Mfg. & Alloying, Inc. v. McIlvain*,
  No. 10-CV-1029, 2011 WL 4467767 (E.D. Pa. Sept. 23, 2011) .....................................10

*hiQ Labs, Inc. v. LinkedIn Corp.*,
  -- F. Supp. 3d --, 2017 WL 3473663 (N.D. Cal. Aug. 17, 2017)..............................9, 18, 19

*International Airport Centers, LLC v. Citrin*,
  440 F.3d 418 (7th Cir. 2006) ...........................................................9, 10, 12, 15

*Satmodo, LLC v. Whenever Commc'ns, LLC*,
  No. 17-CV-0192, 2017 WL 1365839 (S.D. Cal. Apr. 14, 2017).......................................15

*United States v. Nosal*,
  676 F.3d 854 (9th Cir. 2012) (en banc) .......................................................2, 19

*Victor v. Nebraska*,
  511 U.S. 1 (1994)..........................................................................................................18

**Federal Statutes**

18 U.S.C., Computer Fraud and Abuse Act,
  § 1030(a)(5)(A)............................................................................................................9

18 U.S.C., Computer Fraud and Abuse Act,
  § 1030(a)(5) ......................................................................................... *passim*

Internal Revenue Code 409A............................................................................................7

**Other Authorities**

*Internet and Its Many Problems*, Newsweek (Apr. 16, 2016, 2:00 PM) (last visited Sept.
  14, 2017) .....................................................................................................................1

Orin S. Kerr, Computer Crime Law 80 (2d ed. 2009) .....................................................9

19

20

21

22

23

24

25

26

27

28

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

*Valuations*, eShares (Aug. 3, 2017), https://blog.esharesinc.com/the-problem-with-409a-
    valuations (last visited Sept. 14, 2017) ...................................................................................8

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

## INTRODUCTION

This is a strange case.  As the gravity of the charges against defendant Jing Zeng has diminished, the precedential significance of the decision this Court will render has greatly increased.

Mr. Zeng is charged with a federal felony punishable by imprisonment.  In July of 2015, upon leaving Machine Zone ("MZ"), a gaming company, Zeng wiped the drive on his company laptop before returning it to his former employer.  While his decision was stupid and regrettable, it is not the sort of conduct that ordinarily results in a federal criminal trial.

When MZ learned that the laptop had been erased, it panicked.  It was apparently concerned that Zeng might have stolen the source code for its games, or other valuable propriety information.  It was worried that Zeng planned to bring those stolen trade secrets to China.  Like so many large and powerful corporations, rather than simply pursuing civil remedies, MZ also sought the assistance of federal law enforcement.  Following MZ's lead, the FBI initially pursued this case as trade secret theft case, arresting Zeng on a charge of economic espionage.

As it turned out, however, there was no proof that Zeng stole trade secrets, much less that he was planning to give them to the Chinese government.  Once that was clear, one might have expected federal prosecutors to drop the case, leaving Zeng and MZ to resolve any remaining matters in civil litigation.  Instead, prosecutors searched for some other theory of criminal liability.  After various fits and starts, they settled on a "computer damage" charge under the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030(a)(5).  That became the fallback, and that was the sole count on which Zeng ultimately went to trial.

The CFAA is viewed by many as a notorious law.[1]  It was originally passed in the 1980s—before cell phones, the internet, and widespread computer ownership.  At that time, Congress was concerned

---

[1] *See* G. Burningham, *The Most Hated Law on the Internet and Its Many Problems*, Newsweek (Apr. 16, 2016, 2:00 PM), http://www.newsweek.com/most-hated-law-internet-and-its-many-problems-cfaa-448567 (last visited Sept. 14, 2017).

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

about hacking, particularly hacking that threatened national security. But technology has consistently outpaced Congress's ability to understand and define what conduct should and should not be covered. Congress has essentially given up at this point, leaving it to courts to prescribe sensible limits. And numerous courts, including the Ninth Circuit, have held that the CFAA must be interpreted narrowly to avoid criminalizing conduct that ordinary Americans engage in regularly.

Those principles compel acquittal here. The damage provision under which Zeng was charged was designed to punish hackers who use computer viruses to damage computer systems. The law was not designed to cover other misdeeds by employees. Permitting corporations to expand federal criminal liability through overreaching codes of employee conduct—such as a total ban on any form of data deletion—would result in the precise inequities our Circuit was warned against. *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012) (en banc) (stating that the CFAA cannot be interpreted "broadly to cover violations of corporate computer use restrictions").

More formally, the government here failed to prove several elements of the offense. First and most obviously, the government did not prove that Zeng caused any damage by transmission—to the contrary, the government's own witnesses testified that Zeng wiped his computer using the laptop's own native erase program. Second, the government did not prove that Zeng caused any "damage," as courts have interpreted that term. Third, even if there was damage, the government did not prove beyond a reasonable doubt that Zeng's intent was to cause that damage.

Zeng therefore requests that this Court acquit him of the charged count.

### STATEMENT OF FACTS

#### A.      MZ and Zeng Separate

On Friday, July 10, 2015, Zeng met with MZ CEO Gabriel Leydon, COO Kristen Dumont, and the Global Head of People Operations Melissa Lightbody to negotiate the terms of Zeng's departure from MZ. [25:20–26:8; 150:6–18; 280:13–17.] The meeting took place in Dumont's office at MZ's headquarters in Palo Alto. [281:12–16.] Zeng brought his company-issued laptop to MZ that day but

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

left it on his work desk during the meeting. [281:17–282:1.] At the conclusion of the meeting, Zeng and Leydon, who at one point separated themselves from Dumont and Lightbody, [151:15–22; 280:18–20], reached a general understanding of the terms of a severance agreement to accompany Zeng's departure. [151:25–152:3.] As part of this agreement, MZ would advance the vesting of some of Zeng's stock options. [27:23–28:1; 280:21–24; Ex. 3.05–3.20.] MZ had to contact its outside counsel to put the agreement on paper, which was to be completed by the afternoon. [151:25–152:3.]

Zeng left MZ headquarters but was expected to return at 4 o'clock to sign the finalized agreement. [157:15–18.] MZ did not collect Zeng's laptop that Friday. [63:16–64:1.] After the meeting, MZ terminated Zeng's access to the company's network. [163:23–164:3; Exs. 4, 7.] Later, at 4:01 p.m., Lightbody emailed Zeng to notify him that the paperwork was not yet complete. [157:19–21; Ex. 3.01.] As a result, Lightbody presented Zeng with the option to review the forthcoming agreement over the weekend. [157:22–25; Ex. 3.01.] Zeng accepted Lightbody's offer and later received the proposed severance agreement at around 7:00 that night. [153:1–4; 283:11–15; Ex. 3.01; Ex. 3.05–3.20.]

## B.    The Alleged Wrongful Conduct

After reviewing the proposed agreement that weekend, Zeng had become concerned that MZ could revoke the proposed severance agreement if it found cached information of porn that he opened on the laptop. [311:4–20; 324:9–21.] Consequently, on Sunday, July 12, Zeng fully erased the SSD on his laptop. [221:12–19; 294:10–18; 81:25–82:4.] Zeng erased the laptop to hide the porn-related files from MZ. [292:23–293:4.] Zeng did not have the same concerns regarding wiping the hard drive because he had previously wiped "hundreds of machines" and believed that as MZ's Director of Infrastructure, he was authorized to wipe company machines. [325:9–15.] Indeed, Zeng was not worried about erasing his laptop until a conversation with his employment lawyer on the morning of July 15, who informed Zeng that the erasure might cause problems for his severance agreement. [295:1–25.]

Two prosecution witnesses who inspected the erased laptop, Anthony Krainer and Melanie

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

Maugeri, also suggested that Zeng likely wanted to hide files from MZ. [107:21–108:3; 223:11–13.]
For example, when asked to opine why anyone would wipe their work computer, Maugeri opined that
individuals permanently wipe their hard drives "to remove all of the data so there is no . . . cookie
crumbs left behind.  So in my experience, users wipe files to make sure they are not recoverable by
anyone." [223:11–15.]

### C.      The Process of Erasure

The erasure took six steps.  [203:22–24; 294:10–18.]

1.   Zeng powered on his computer and immediately held down the Command R button,
     triggering the laptop's internal recovery mode.  [198:12–18; Ex. 19D.01.]

2.   In the laptop's internal recovery mode, Zeng was presented with four options.  Zeng chose
     the fourth option titled "Disk Utilities," which permits a user to repair or erase the disk.
     [199:8–14; 200:5–7, 15–19; Ex. 19D.03.]

3.   After Zeng selected the "Disk Utilities" option, his laptop generated another window that
     prompted three more steps.  The first of these steps was to select the disk that Zeng was
     erasing, in this case the laptop's SSD.  [202:6–12; Ex. 19D.04.]

4.   Zeng then pressed the "Erase" button near the top of the window.  [202:13–18; Ex. 19D.04.]

5.   After selecting the "Erase" button near the top of the window, Zeng clicked on the "Erase
     tab" that appears on the bottom right part of the screen.  [202:16–18; Ex. 19D.04.]

6.   In the final step, Zeng once again pressed an "Erase" button that appeared on a pop-up
     message, thereby confirming that he was sure he wanted to erase the SSD.  [203:9–21; Ex.
     19D.05.]

The erasure was then complete, resetting the SSD back to factory settings.  [203:20–204:8.]  The
erasure process was internal to the components of the laptop, meaning the laptop was never attached to
any external device or the internet during the erasure process.  [204:9–18.]  The laptop did not even have
to be connected to an external power supply.  [*See* 209:22–25.]

At the conclusion of the erasure process, the laptop returned to the "Disk Utilities" window in
laptop's internal recovery mode.  [205:19–23; Ex. 19D.06.]  Zeng subsequently initiated a reinstallation
of the operating system.  [206:1–7; Ex. 19D.06.]  After Zeng initiated the reinstallation process, the
laptop prompted Zeng to connect to the internet.  [206:11–22.]  The government's expert, Melanie

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

Maugeri, identified the subsequent reinstallation of the operating system as "the transmitting part of this process." [229:11–13.]  Maugeri explained that to her, "Transmit . . . would be more of transmitting something from here to there . . . .  Two separate locations." [228:25–229:3.]  Maugeri further testified that all of the deletions to the SSD occurred before the transmitting part of the process.  [231:4–9.]  The reinstallation of the operating system therefore did not delete anything.  [231:7–9.]

### D.      MZ's Response to the Erased Laptop

After his conversation with his employment lawyer on July 15, Zeng went to MZ to return the laptop.  Zeng dropped the laptop off with Amy Aureus, an HR Business Partner, informing her that he left a sticky note on the laptop that had a new password.  [81:14–15; 155:22–156:4.]  Senior IT Manager, Anthony Krainer, subsequently examined the laptop.  [94:14–97:15; Ex. 6.]  Although Krainer did not notice the sticky note on the laptop, [125:24–126:3], he was able to shut down the computer and reboot it into a mode that allowed him to access the current operating system.  [96:22–97:6.]  Later that day, Krainer informed COO Dumont that the laptop had been wiped and reformatted.  [33:15–16; 81:25–82:4.]  Dumont therefore determined, before MZ initiated its internal investigation and sent the laptop out for further forensic review, that "[MZ] lost everything that was on that laptop."  [33:21–23.]

When it learned that Zeng had erased his laptop, MZ reacted strongly.  The MZ witnesses who testified at trial testified that they were "panicked" and considered it a "code red" situation.  As result, on the same day Zeng returned the laptop, Dumont instructed MZ's legal department to revoke Zeng's severance.  [33:15–20.]  Meanwhile, MZ formed an "internal incident response team," consisting of members of MZ's executive team, to further investigate the laptop and any other company systems Zeng accessed.  [43:1–18.]

MZ eventually contacted law enforcement.  The government's subsequent investigation also revealed that Zeng shared his credentials to a beta version of MZ's latest game, Mobile Strike, with a person in China named Gu Jun.  [240:13–241:16; Ex. 31.08.]  Specifically, Zeng shared his credentials on July 8 and 9 to test MZ's content delivery network ("CDN") performance in China.  [272:4–23.]

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

Zeng had been interacting with Gu Jun for over six months to work on the CDN project in China. [349:21–350:11.] MZ was aware of this project as other MZ officials were included on emails with Gu Jun. [350:12–15.] Moreover, the project was performed at the direction of MZ's CTO Halbert Nakagawa who had checked in on the project's progress as late as May 28, 2015. [266:13–16; 350:15–25.] By testing the CDN in China, Zeng hoped he could boast about his accomplishments on the CDN project to Leydon at the July 10 meeting. [272:7–17; *see also* Ex. A.]

### E.    The Erased Information as "Damage"

After the erasure, MZ could no longer access certain digital "footprints[s]," files that should have been recorded locally on the laptop prior to the July 12 erasure. [105:3–10; 45:13–15.] Such files track various functions on the laptop, including those involving devices that are attached to the laptop, [104:20–24], as well as downloads from the laptop. [102:25–103:2.][2]

Accordingly, to ascertain and review the information Zeng accessed and downloaded from MZ, MZ could and did monitor Zeng's MZ user account activity from various network logs such as its LDAP logs, [Ex. 7], VPN logs, [Ex. 8], and Tableau activity logs, [Exs. 9–10.][3] MZ analyzed, for example, every workbook that Zeng accessed with his Tableau credentials. [173:15–174:4; Exs. 9–10.] MZ confirmed that Zeng never accessed MZ's network after Zeng's credentials were terminated at about noon on July 10. [80:24–81:2; *see also* 163:23–164:3.] Similarly, MZ was able to confirm that Zeng never attempted to access MZ's source code. [79:17–23.] Those logs also confirmed that Zeng never used his credentials to access, much less download, the Tableau-related spreadsheets introduced as Exhibits 33 and 34. [Exs. 9–10, 33–34.]

When asked by the Court to identify any specific files or data believed to have been impaired or damaged, Dumont, a member of the internal incident response team assembled to respond to the erasure,

---

[2] Prior to trial, Zeng's counsel had offered to provide the government Zeng's external devices for review. [251:11–13.]

[3] Tableau is a business analytics database MZ uses to track user behavior including when users install MZ's game, where they install the game, how they play the game, how long it takes to log in, how long it takes to advance levels, how much users spend, and where they are located. [21:1–10.]

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

[43:1–10], identified MZ's loss of "Meraki files." [88:25–89:9.] MZ installs Meraki, a data security

software, on its devices in order to track "what's inside that machine and what's going on in that

machine."[4] [100:18–24.] Meraki does not store data onto a local drive. [89:11–13.] Instead, Dumont

explained that Meraki transmits the data externally to MZ's network. [89:13–14.] After July 10, Meraki

continued to track various activities on Zeng's laptop. However, once Zeng erased his laptop on July

12, he automatically removed Meraki from the SSD. [111:21–112:10; 121:25–122:8.] Meraki thus did

not transmit data to MZ after July 12, the day the laptop was wiped. [89:3–7.]

### F.      The Tableau Data Accessed by Zeng

MZ's internal investigation revealed that during the course of his employment, Zeng accessed

Tableau. [83:1–3; 80:24–81:2; Exs. 9–10.] Access to Tableau is restricted to limited MZ employees as

the database is highly confidential. [21:25–22:7.] Zeng was one such employee who was permitted to

access Tableau because he had a legitimate business purpose for accessing certain information on

Tableau. [50:4–6; 77:5–12; 171:17–25; 261:25–262:2; Ex. 2.]

MZ's internal investigation revealed that Zeng accessed a large number of Tableau files on July

9 and 10 before Zeng's meeting with Leydon, Dumont, and Lightbody. [69:25–70:7; 174:19–21; 278:6–

8; Exs. 9–10.] During these sessions, Zeng did not have the ability to download documents from

Tableau. [352:17–20; *see also* 76:1–7.] Rather, he took screenshots of the database, which he had

stored on the laptop. [277:10–14; 293:5–7.] Zeng testified that he accessed Tableau the evening before

his July 10 meeting "for personal reasons." [273:8–9.] Zeng accessed Tableau "to evaluate [MZ's] . . .

stock option value." [273:11–13.] MZ was a privately held company at the time.[5] [18:20–21.]

---

[4] Dumont testified that Meraki "can keep track of where all the devices are, whether or not passwords are properly
loaded on those, what apps are installed." [38:12–15.] Krainer testified that Meraki allows MZ "to track exactly
where [a machine] is, what's being installed on it, what type of resource it has that's being allocated to it, whether
there's issues with the hard drive, things of that nature." [100:19-22.] Meraki does not keep track of whether
someone downloaded a document. [101:20–23.] Chau testified that Meraki "allows [MZ] to turn off the
computer or lock the computer in case of loss or theft. Allows [MZ] to track the laptop itself." [136:15–21.]
[5] MZ was a privately held company in July 2015 and remained so as of the date of trial. [31:3-6.] For the purpose
of valuing stock option grants, private companies compute valuations, which are governed by Internal Revenue
Code 409A. 409A valuations, however, are notoriously unreliable, in part because companies often set them

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

Moreover, Zeng wanted to evaluate the company's future value, [335:6–12], as he was hopeful he could convince Leydon to grant him an acceleration in the vesting of his stock options. [26:18–27:4; 150:11–18; 273:14–274:2; Ex. A.03.] These financial data stored on Tableau were important to Zeng as he would have had to make a cash investment of about $200,000 to exercise his stock options. [274:3–16.] There is no allegation or evidence that Zeng damaged or impaired any data in Tableau. [*See* 88:21–24.]

Dumont's testimony confirmed that Tableau can be used to evaluate the potential of MZ's stock value. Specifically, Dumont noted that the significant driving force behind MZ's valuation in the summer of 2015 was "Game of War revenues." [19:6–8.] MZ maintained its Game of War revenue data in Tableau. [21:4–12; 22:16–19.] Dumont further stated that although data approximating Game of War's revenue were publically available, such data were "very off." [22:16–23:7.] Thus, Dumont echoed Zeng's testimony that one "can use the Tableau information to value the company." [339:13–14.]

## ARGUMENT

## I.  THE GOVERNMENT FAILED TO PROVE THE TRANSMISSION ELEMENT

The parties dispute several elements of the alleged offense. As to some of those disputes, this Court may be required to make credibility findings and difficult factual determinations. For example, if this Court reaches the intent element, it will have to make credibility findings to determine whether the government proved beyond a reasonable doubt that Zeng intended to cause damage to his employer's computer.

But this case can be resolved in a much simpler fashion. As to the transmission element, there is no factual dispute. Rather, there is simply a relatively straightforward legal question—whether use of a computer's native commands constitutes "transmission" for the purposes of the CFAA. For the reasons

---

intentionally low in order to keep option strike prices low. *See* Chad Willbur, *The Problem with 409A Valuations*, eShares (Aug. 3, 2017), https://blog.esharesinc.com/the-problem-with-409a-valuations (last visited Sept. 14, 2017).

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

given below, that question must be answered in the negative.  Zeng must be acquitted on that ground alone.  And ruling on that ground would obviate the need to examine any other elements.

### A.        The Requirement of External Transmission

Section 1030(a)(5) is colloquially referred to as the computer damage statute, but it does not actually criminalize all computer damage.  For example, taking a hammer to a laptop would not violate the statute, even if it succeeded in destroying the machine and all of its contents.  That is because the statute has an additional element of transmission.  This is an essential element of the offense.  The transmission element requires the government to demonstrate that the defendant "cause[d] the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[d] damage . . . to a protected computer."  18 U.S.C. § 1030(a)(5)(A).  In short, it is not sufficient to prove damage to a computer.  Rather, the government must prove damage to a computer that was caused by transmission of some code.

The reason for this is obvious.  When it passed § 1030(a)(5), Congress was not concerned about employees with hammers.  Rather, Congress was concerned about those who send computer viruses, worms, and malware, or those who engage in tactics such as denial of service attacks.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, -- F. Supp. 3d --, 2017 WL 3473663, at *8 n.11 (N.D. Cal. Aug. 17, 2017) (noting that § 1030(a)(5) would create liability for denial of service attacks); Orin S. Kerr, Computer Crime Law 80 (2d ed. 2009).  That is the core conduct at which the CFAA's computer damage provision is aimed.  And it is precisely the transmission element that limits computer damage provision to that type of conduct.

The parties agree on at least the general contours of what the transmission element requires.  As both Zeng and the government have argued, the leading authority on this point is the Seventh Circuit's decision in *International Airport Centers, LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006).  The *Citrin* court held that "merely erasing a file from a computer is not a 'transmission.'"  *Id*. at 419.  To rule otherwise would stretch the statute far beyond its purpose and would also risk criminalizing a variety of innocuous

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

conduct.  "Pressing a delete or erase key in fact transmits a command, but it might be stretching the statute too far (especially since it provides criminal as well as civil sanctions for its violation) to consider any typing on a computer keyboard to be a form of 'transmission' just because it transmits a command to the computer."  *Id*.

The government has not argued that *Citrin* was wrongly decided.  To the contrary, the government has accepted that holding. [6]  And in the decade since *Citrin*, other federal courts have reaffirmed the same point.  *See Grant Mfg. & Alloying, Inc. v. McIlvain*, No. 10-CV-1029, 2011 WL 4467767, at *8 (E.D. Pa. Sept. 23, 2011) ("[S]ummary judgment is appropriate because pressing a delete key does not constitute a 'transmission' within the meaning of the CFAA . . . ."); *Dedalus Found. v. Banach*, No. 09-CV-2842, 2009 WL 3398595, at *3 (S.D.N.Y. Oct. 16, 2009) (same).

These cases stand for a simple proposition—using a computer's own internal, native code or software to delete information is not a "transmission."  Even if that deletion causes "damage," the damage is not actionable under the CFAA because it was not damage resulting from transmission.  It is more akin to smashing a hard drive with a hammer.  Such conduct might be stupid or immoral, and it could result in civil or state law liability, but it is not a federal crime.  This all makes perfect sense as a policy matter, given that the primary purpose of § 1030(a)(5) was to punish transmission of viruses and worms—which is, after all, much more serious conduct that poses a much more serious threat to interstate commerce and the national economy.

In sum, the text and purpose of the statute, as well as the federal cases interpreting the statute, all support the idea that using a computer's native commands to delete files does not constitute a "transmission."  Transmission means transmission from some external source.

## B.    Zeng's Acts Erasing the Laptop

With respect to the transmission element, the facts in this case are undisputed.  The government

---

[6] *See* Dkt. 87, Govt. Trial Br. 11 ("The parties agree that this case [*Citrin*] provides the essential authority regarding this element.").

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

proved, and Zeng admitted, that Zeng used his laptop's internal disk utility function to erase the laptop. Using a series of keystroke and mouse commands, Zeng opened the disk utility function, clicked on the erase button, and confirmed that he wanted to do so.  With this series of commands, Zeng erased the laptop's SSD and all of its contents.  After erasing it, Zeng then re-installed an operating system and later returned the blank laptop to MZ.

Zeng did not send a virus or a worm to the laptop.  He did not use external software to erase anything.  He did not have to connect to the internet to use the disk utility erasure function.  Rather, he simply used the computer's own internal, native software, in the same way that anyone who owns a Mac laptop could open the disk utility erasure function and use it to erase the drive.  On any straightforward application of the text of the statute and case law, Zeng is not guilty.

The government will be left trying to fit a square peg in a round legal hole.  It has only two possible arguments, neither of which holds up.  First, it can try to argue that the use of the laptop's native erase function constitutes a transmission.  Second, it can try to argue that after Zeng erased the laptop, he subsequently re-loaded external software (i.e., the operating system) via a transmission—and that, in deciding the transmission element, this Court should consider the entire sequence of events rather than the erasing act itself.

## C.   Internal Transmission

It is at least possible that the government will argue that when Zeng used the laptop's disk utility erasure function, he "transmitted" codes and commands that resulted in damage.  At trial, when the government's expert witness Melanie Maugeri was on the stand, this Court asked a series of direct questions about whether Zeng had transmitted anything to accomplish the deletion.[7]  When this Court asked how she would define "transmit," she initially responded that the word means "transmitting something from here to there," in other words, between "[t]wo separate locations."  [228–29.]  Perhaps

---

[7] Although it is not visible in the written transcripts, this Court will no doubt recall that Ms. Maugeri struggled to answer these questions.

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

sensing that she had inadvertently conceded something damaging to the government's case, she then attempted to backtrack. When asked by the Court whether using an internal erase function involves a transmission, she responded: "Well, the internal components would transmit a signal to the SSD." [229:20–21.]

The government may attempt to argue, based on Ms. Maugeri's testimony, that the internal erase function itself constitutes a transmission. This argument is easily dismissed, in part because it proves far too much. Of course it is true that a computer's native erase function sends an electronic signal from one component of the computer to another. But everything that a computer does sends such a signal— every tap of a key on a keyboard and every move of a mouse transmits some internal electronic signal. If it were true that internal transmission of electronic signals constituted a "transmission" of code under the CFAA, then everything done with or by a computer—including hitting a delete key—would count as a transmission.

This interpretation of the statute would render the transmission element so trivial that it would be virtually meaningless. It would also directly contradict *Citrin*, which held that "merely erasing a file from a computer" using a delete or erase key "is not a 'transmission.'" 440 F.3d at 419. Given that the government has previously accepted the holding of *Citrin*, Zeng does not expect the government to argue otherwise now. If it does, however, this Court should reject that reading of the statute.

### D.    Course of Conduct

More likely, the government will make an argument based on the overall course of conduct or sequence of events. After erasing his computer, Zeng re-installed an operating system, and the government presented evidence that he must have connected to the internet to do so. Unlike the internal native commands, the re-installation process did involve an external transmission. The government will likely argue that, even though the deletion itself was accomplished by native commands, it was soon followed by an external transmission. The government will argue, in other words, that this Court should consider the entire sequence as a single act.

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

This argument should face an initial intuitive hurdle. The statute in question was designed primarily to combat hacking attacks employing computer viruses and like tactics. In arguing for liability based on the overall course of conduct, the government would be arguing that the core criminal conduct here was installing a standard Mac operating system onto a Mac laptop. That is, to put it mildly, somewhat counterintuitive. Even setting that point aside, however, the government's argument faces a more obvious legal hurdle: the requirement of actual or but-for causation.

Section 1030(a)(5) contains an explicit causation requirement. It states that a defendant must "cause[]" damage "as a result of" the transmission. It is not enough that there is some transmission, and that there is also some damage. Rather, the two must be causally connected. The transmission must cause the damage.

As the Supreme Court has squarely held, when a criminal statute includes causation language of that sort, it must be interpreted strictly to include the traditional requirements of actual or but-for causation. Statutory phrases such as "results from" or "as a result of" must be given their ordinary meaning. *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995). Absent explicit Congressional direction to the contrary, these phrases incorporate "a requirement of actual causality." *Burrage v. United States*, 134 S. Ct. 881, 887 (2014). That means but-for causation. This requires proof that "the harm would not have occurred in the absence of" the forbidden conduct. *Id.* at 887–88 (internal quotation marks omitted).

That requirement cannot be met here. The alleged damage was the deletion of the laptop's contents. The alleged transmission was the installation by external transmission of the operating system. But those two things were not causally related. By the time Zeng began to install the operating system, any damage was done. It cannot be said that, in the absence of installing the new operating system, the harm would not have occurred. To the contrary, if Zeng had simply stopped after using the disk utility erasure function and had not proceeded to re-install the operating system, the exact same "damage"

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

would have resulted.

Nor it is enough to argue that the conduct played some nonessential contributing role in producing the forbidden result.  In fact, that is precisely the proposition that the Supreme Court rejected in *Burrage*:

> Consider a baseball game in which the visiting team's leadoff batter hits a home run in the top of the first inning.  If the visiting team goes on to win by a score of 1 to 0, every person competent in the English language and familiar with the American pastime would agree that the victory resulted from the home run. . . . By contrast, it makes little sense to say that an event resulted from or was the outcome of some earlier action if the action merely played a nonessential contributing role in producing the event.  If the visiting team wound up winning 5 to 2 rather than 1 to 0, one would be surprised to read in the sports page that the victory resulted from the leadoff batter's early, non-dispositive home run.

134 S. Ct. at 888.  The same is true of nonessential subsequent events.  If the visiting team won 8 to 0, one would be surprised to read that the victory "resulted from" a batter's late-game solo home run scoring the eighth run.

But-for causation means that the conduct must be essential to producing the result.  That is not what happened here.  Any damage to the laptop was caused by Zeng's use of the native erase function. That damage would have been done regardless of whether Zeng did or did not subsequently re-install Mac operating system.  The only possible external transmission in the sequence of events here was the re-installation, and the re-installation did not cause the deletion of files.  Consequently, the government failed to prove the transmission element, and Zeng must be acquitted.

## II.     THE GOVERNMENT FAILED TO PROVE THE DAMAGE ELEMENT

As argued above, this case can be resolved quickly and simply on the transmission element alone.  But even assuming arguendo that the government proved some sort of transmission, it did not prove the damage element.

The government's theory of damage has been a moving target.  When this case first started, it seemed that the government's theory might have something to do with the Tableau database itself.  But

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

though Zeng viewed Tableau and took screenshots, he did not alter or delete anything in Tableau. Deletion of the screenshots cannot be considered "damage" under the CFAA, because those screenshots were mere electronic copies.  The same information still existed on Tableau, and that information was stored on MZ's servers.  There was no "damage" to those servers or to Tableau.

As the case progressed through various pretrial proceedings, the government seemed to focus on Meraki rather than Tableau.  The information filed in 2016 stated that "the laptop computer contained software installed by Machine Zone," and that when Zeng wiped the laptop, he deleted some "Machine Zone software."  (*See* 4/22/16 Information at ¶¶ 2–5.)  That was the government's theory of guilt at that time, which was also reflected in the ill-fated stipulation subsequently reached by the parties.  Although the phrase "Machine Zone software" was somewhat vague, it appeared to refer to the Meraki software.

But Meraki is not actually software that MZ wrote.  Rather, it is a third-party networking and security software for which MZ purchased a license to use on its computers.  And, as the evidence at trial showed, Meraki does not store any data on the laptop's local drive.  Rather, it transmits data to the company's centralized server or computer system, where they are stored.  And deleting Meraki itself is no different from deleting a licensed copy of Microsoft Word, in that it can be easily restored.

At trial, the government appeared to shift away from Meraki and focus on "logfiles" instead.  But "logfiles" is a general term that simply refers to any file that records some event or process or transaction, and modern computers store thousands or millions of them, at least temporarily.  For example, some log is generated every time an application is opened, such as a web browser.  Most computers delete logfiles automatically after some time, or logfiles can be manually deleted by the user to save disk space.  It would be extraordinary for the government to take the position that deletion of logfiles constitutes a federal offense.

At this point, however, Zeng does not know whether the government will take that position—the government's theory of damage has never been specified.  Zeng's legal position remains the same.  To

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

prove damage under the CFAA, the government must prove permanent deletion of something that has a meaningful value to the computer owner. *See Citrin*, 440 F.3d at 419, 421; *Satmodo, LLC v. Whenever Commc'ns, LLC*, No. 17-CV-0192, 2017 WL 1365839, at *5 (S.D. Cal. Apr. 14, 2017) ("Plaintiff must allege facts that demonstrate that their data was destroyed, their computer system was harmed, or there was an inability to access their own computer data.").

Zeng will respond more fully once the government sets out its theory of damage in its opening brief. Suffice it now to say, the government did not prove that Zeng harmed MZ's computer system or permanently deleted any valuable information. The information alleged that Zeng had deleted some MZ software, but the evidence at trial showed nothing of the sort.

## III.   THE GOVERNMENT FAILED TO PROVE THE INTENT ELEMENT

Whatever the government's theory of damage turns out to be, damage alone is not sufficient to prove guilt. The government must also prove that it was Zeng's conscious object to cause that damage. Here again, it is difficult to address this point without knowing what the government's theory of damage is. If, for example, the government settles on a theory that the damage was deletion of certain logfiles, then the government must demonstrate that Zeng's intent was to delete those logfiles. The very fact that the government's theory of damage has shifted over time is itself nearly fatal to the intent element.

In any event, it is fair to say that the evidence on intent was disputed at trial and will be disputed in this round of briefing. In fact, the question of Zeng's intent is really the only aspect of this case where there is a true factual dispute. The government offered no direct evidence of Zeng's mental state at the time of the erasure, while Zeng testified that he was merely trying to delete embarrassing personal material, including pornography, from his laptop before turning it in. The government has never taken the position that merely deleting personal files or pornography from a company computer would constitute "damage" under the CFAA. So the government will no doubt argue that Zeng's testimony regarding his intent was not credible. And admittedly, at trial, this Court appeared to evince some

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

skepticism regarding Zeng's testimony on this point.  This Court asked Zeng why, if he simply wanted to delete certain files, he did not simply delete those files selectively rather than wiping the entire drive.

That is a reasonable question to ask—but the government's own computer expert testified that, even after certain files are deleted, there are almost always some "cookie crumbs" left behind somewhere.  [223:13.]  Even if a particular photo is deleted, there may be a cached version somewhere, or other recoverable echoes of the primary file.  Selective deletion is not easy to accomplish.  As Ms. Maugeri testified, the reason that people wipe drives is to ensure that no "cookie crumbs" can be found—because wiping the entire drive is the only sure way to accomplish total deletion of a particular file.  That is particularly true here, as Zeng was concerned with erasing not only data evidencing visits to porn sites, but also personal photographs of his ex-girlfriend of a lurid nature, material less to be within the reach of a program designed to locate and wipe clean porn-related files.

Furthermore, if the defense theory of Zeng's intent—that he wanted to erase the pornography and its traces—raises the Court's question of why he did not do so selectively, the government's theory of intent—that Zeng wished to wipe out evidence of access to, or downloads of, proprietary information—raises that same issue.  Why not try to erase the evidence of proprietary information alone, thereby avoiding the firestorm caused by the wholesale erasure?  But beyond that, the erasure in no way eliminated MZ's ability to establish that Zeng had extensively accessed Tableau in the days before his meeting with CEO Leydon on July 10.  That access was tracked in MZ's computers, as Zeng surely knew it would be.

Based on the cookie crumb problem, the government will argue an inference of guilt.  It will argue that Zeng may have copied something proprietary or at least thought about doing so, so he wiped the drive to ensure that there was no evidence of his theft.  But the cookie crumb problem also supports an inference of innocence.  Zeng had embarrassing materials on the computer, so he wiped the drive to ensure that there was no evidence of his porn habits.  The former theory of Zeng's intent is no more

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

convincing than the latter.  It should be noted that if Zeng had been bent on preventing MZ from learning that he had improperly accessed or downloaded proprietary information, the logical time to do a cleansing would have been before he arrived at MZ's headquarters on June 10 with the laptop in hand, prepared to turn it in at that time.  The erasure two days later resulted from an impulsive and counterproductive decision during a stressful event in Zeng's life.

The question for this Court is whether the government's proposed inference—of a culpable intent to damage from the factual circumstance of erasure—is so strong that it is convincing beyond a reasonable doubt.  And it is here, on the disputed question of intent, where the reasonable doubt standard matters most.  The government's claim of an intent to damage may be one possible view of the facts, but the evidence of Zeng's mental state in performing that erasure comes nowhere near establishing guilty intent to the high degree of certainty that the beyond-a-reasonable-doubt standard requires.  *See Victor v. Nebraska*, 511 U.S. 1, 14–16 (1994).  The failure of proof on this point provides independent grounds for acquittal.

## IV.    THE RULE OF LENITY AND CONSTITUTIONAL AVOIDANCE

The intent element is heavily factual, but most of the core issues presented in this case are purely legal.  The outcome of this case may turn on this Court's legal determination of the meaning of "transmission" and "damage."  Those are difficult determinations, because in drafting the relevant provision of the CFAA many years ago, Congress failed to define those terms with specificity.  The definitions that Congress gave are vague and not particularly helpful in the concrete circumstances presented here.

It is precisely in situations like this where the constitutional requirements of fair warning have force.  To the extent that there is doubt regarding these legal points presented in this case, those doubts should be resolved in Zeng's favor.  Ambiguity regarding the scope of criminal liability must be resolved in favor of lenity, and statutes must be interpreted to avoid constitutional difficulties.

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

In a ruling on the CFAA issued last month, Judge Chen eloquently stated these points. *See hiQ Labs*, -- F. Supp. 3d --, 2017 WL 3473663. In that case, he noted that one party's "construction of the CFAA is not without basis." *Id*. at *5. In rejecting that construction, however, Judge Chen followed the Ninth Circuit's guidance in *Nosal*. He held that the "CFAA must be interpreted in its historical context, mindful of Congress' purpose," and not in a way that would "expand its scope well beyond computer hacking." *Id*. at *6 (quoting *Nosal*, 676 F.3d at 859.) Finally, Judge Chen ruled that because the CFAA is a criminal statute, it must be interpreted in accordance with the rule of lenity and the canon of constitutional avoidance. *Id*. at *6–9, nn.7, 12.

Those principles apply here with equal force. Section 1030(a)(5) was enacted primarily to punish hackers who transmit computer viruses to damage computer systems. The government now wants to expand that provision to cover an employee who uses a laptop's native erase function to wipe his company laptop before returning it. But employees erase files on their company computer constantly—indeed, every time that an employee clears her browser history or empties her computer trash, she thereby deletes files. Sometimes employees do that for entirely innocuous reasons, sometimes not. But the point is that the government's reading would stretch the CFAA far beyond its intended bounds to reach that sort of conduct.

A broad interpretation of the computer damage statute would risk "unintentionally turn[ing] ordinary citizens into criminals." *Nosal*, 676 F.3d at 863. The government's arguments are inconsistent with the text, history, and structure of the CFAA, and they are inconsistent with the case law interpreting § 1030(a)(5). If accepted, they would also present serious constitutional problems. Those arguments must not be sustained.

/ / /

/ / /

/ / /

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1

# CONCLUSION

For the reasons stated, the Court should enter a judgment of acquittal for defendant Zeng as to the offense charged.

Dated:  September 15, 2017                Respectfully submitted,

DENNIS P. RIORDAN
DONALD M. HORGAN
TED SAMPSELL-JONES
RIORDAN & HORGAN

THOMAS F. CARLUCCI
JAIME DORENBAUM
FOLEY & LARDNER LLP


 /s/ Dennis P. Riordan
DENNIS P. RIORDAN

Attorneys for Defendant
JING ZENG

4817-9438-3183.1

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document has been served to all counsel of record, listed below, who are deemed to have consented to electronic service via the Court's CM/ECF system per Civil L.R 5-1.  The undersigned further certifies that a true and correct copy of the foregoing document has been served via mail and e-mail on the counsel of record who are not registered participants of the CM/ECF system, listed below.

I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on September 15, 2017.

*/s/ Thomas F. Carlucci*

THOMAS F. CARLUCCI

ELECTRONIC MAIL NOTICE LIST

Candace Kelly     Candace.Kelly@usdoj.gov, rosario.calderon2@usdoj.gov

John Henry Hemann     john.hemann@usdoj.gov, jacquelyn.lovrin@usdoj.gov

Joseph E Springsteen     joseph.springsteen@usdoj.gov, CaseView.ECF@usdoj.gov

Laura Elizabeth Vartain Horn     laura.vartain@usdoj.gov, CaseView.ECF@usdoj.gov

Dennis Patrick Riordan     dennis@Riordan-Horgan.com

COURTESY COPY

Chambers Copy
James Donato
United States District Judge
Clerk's Office
San Francisco Courthouse
450 Golden Gate Ave.
San Francisco, CA 94102
Case No. CR 16-00172 JD

ZENG CLOSING ARGUMENT
Case No. CR 16-00172 JD

4817-9438-3183.1